lator has appealed from an adverse decision of his suit. The appeal is suspensive. But we do not see what relief can be extended to relator, since the election of April 24th has now taken place; and there is no longer any election at which the relator could be a candidate. The appeal must therefore be dismissed.

Appeal dismissed.

———

(75 South. 811)

No. 22506.

STATE v. O'DONNELL.

(June 11, 1917. Rehearing Denied June 30, 1917.)

*(Syllabus by Editorial Staff.)*

1. LIBEL AND SLANDER ☜145 — CRIMINAL LIBEL—LIBELOUS WORDS.

A statement that the commission council of a city was about to use the city's funds for buying and operating a race track for the city would not be libelous, as it would not charge the members of the council with moral turpitude or want of integrity or necessarily bring them into disrepute.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 404.]

2. LIBEL AND SLANDER ☜148—CRIMINAL LIBEL—LIBELOUS WORDS.

Defendant published in his newspaper an article referring to a report that a racing association which was almost bankrupt and which had previously purchased "the City Park race track" was about to purchase "the Fair Grounds race track." The article stated that the city administration had fathered for the association the purchase of the City Park track, and that possibly it was also fathering this later deal, and asked who was furnishing the money for the new purchase, "the political crowd or the city treasury," and whether the city hall had gone into the racing business or was trying to get a corner on the sport, and further stated that the city administration made a serious mistake of quitting its task of running the city to foster the sport of racing, and that there could be little hope for the community if those placed in office were reckless enough to concoct or condone deals such as the one proposed, and that if H. and his associates, owners of the fair grounds, had a chance to play with the city treasury, it would not take much imagination to understand what could happen. It further stated that it was also reported that the association would build a concrete grand stand, but that all this was too silly to be taken seriously.

*Held* that, where no libel was claimed in connection with the statement that the city administration fathered the purchase of the City Park track, the article was not libelous, as everything else stated concerning the city administration was stated hypothetically by way of inference and comment, and comment on a matter of public interest especially by a newspaper is not libel when the facts are stated, and the reader is left to judge of the correctness of the inferences and the comments.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 407–411.]

3. LIBEL AND SLANDER ☜152(2) — CRIMINAL LIBEL—INDICTMENT—INNUENDOES.

The office of an innuendo in an information for libel is to put upon the publication the construction which the prosecution contends for.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 419, 424.]

4. LIBEL AND SLANDER ☜148 — CRIMINAL LIBEL—LIBELOUS WORDS.

In order not to be libelous, comment must be fair and free of malice.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 407–411.]

5. LIBEL AND SLANDER ☜145—CRIMINAL LIBEL—LIBELOUS WORDS.

A libelous implication may be conveyed by insinuation or by a question suggestive of an answer or accompanied by matter suggestive of the answer.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 404.]

Appeal from Criminal District Court, Parish of Orleans; Frank D. Chretien, Judge.

Hugh A. O'Donnell was convicted of libel, and he appeals. Judgment set aside, and defendant discharged.

S. A. Montgomery, of New Orleans (Armand Romain and J. D. Dresner, both of New Orleans, of counsel), for appellant. A. V. Coco, Atty. Gen., Chandler C. Luzenberg, Dist. Atty., and A. D. Henriques, Asst. Dist. Atty., both of New Orleans (V. A. Coco, of Marksville, of counsel), for the State.

PROVOSTY, J. The accused has appealed from a conviction upon the following information:

"That, on the 6th day of January, 1917, the commission council of the city of New Orleans was composed of Martin Behrman, mayor, Adolph G. Ricks, Harold W. Newman, Edward

E. Lafaye, and Edmond J. Glenny, as commission councilmen, and that at the time there existed in the city of New Orleans an association known as the Business Men's Racing Association, which said association was for the purpose of conducting horse racing in the city of New Orleans, and that the said Business Men's Racing Association had purchased a tract of land in the city of New Orleans known as the City Park race track from one H. D. Brown; that the said Hugh A. O'Donnell, of the parish of Orleans, on the 6th day of January, in the year of our Lord one thousand nine hundred and seventeen, within the jurisdiction of the criminal district court for the parish of Orleans, unlawfully and maliciously contriving and intending to villify and defame the said Martin Behrman, mayor, Adolph G. Ricks, Harold W. Newman, Edward E. Lafaye, and Edmond J. Glenny, commission councilmen, of the city of New Orleans, and to deprive them of their good name and reputation, and to bring them into scandal and disgrace, did unlawfully and maliciously compose and publish and cause and procure to be composed and published, in a certain newspaper called the Orleans American, published and circulated in the said parish of Orleans, state of Louisiana, he, the said Hugh A. O'Donnell, being the editor and publisher of the aforesaid newspaper, a certain false, scandalous, malicious, and defamatory libel of and concerning them, the said Martin Behrman, mayor, and the said Adolph G. Ricks, Harold W. Newman, Edward E. Lafaye, and Edmond J. Glenny, commission councilmen of the city of New Orleans, of the tenor following:

" 'Has New Orleans gone insane over racing? Only a few months ago the Business Men's Racing Association, almost in a state of bankruptcy, went out in the highways and byways to sell extra stock in order to get together enough cash for the payment of $75,000 on a contract of over $401,000 which it obligated itself to pay for the City Park race track.

" 'That deal in itself was an astounding example of frenzied finance, since nearly all of the assets of the association had to be used to promote the National Farm and Live Stock Show just closed.

" 'This was all the more extraordinary from a business standpoint in view of the fact that next season there can only be less than 36 days of racing in New Orleans, which almost makes a big losing racing season next year a certainty; for the liabilities must be taken care of each year, regardless of the profits or losses from racing, due either to bad management, bad weather, bad calendar, or all.

" 'But yesterday the Daily States, the "organization" mouthpiece through which the political boss sometimes issues his orders to city hall and the rest of the bell boys, published a story to the effect that the Business Men's Racing Association is about to buy for $400,000 the fair grounds in order to keep out rivals in racing.

" 'The city administration has made no secret that it fathered for the Business Men's Racing

Association the purchase of the City Park race track from H. D. Brown, and in view of the fact that this story is published in the "only Democratic" political organ of the "machine," possibly the city administration is also fathering this later deal as to the fair grounds.

" 'But, if so, who is furnishing the money, the political crowd or the city treasury? Combination deals amounting to over $800,000 are not altogether mere scraps of paper. Only $75,000 has been paid of the $801,250.00 under negotiation.

" 'And the Business Men's Racing Association itself is authority for the statement that it had to send out an army of solicitors on the streets of the town to sell stock for cash to make the first payment required on the Brown deal.

" 'Has the city hall gone out and out into the racing business, or is it trying to get a "corner" on that sport from which profit can only come from the gambling connected with it?

" 'It is true that the organization at the fair grounds right now is pretty well filled with the sons of city officeholders, enjoying added sinecures of "near silk" graft.

" 'The contract with H. D. Brown binds the Business Men's Racing Association for eight years in regard to dates, and that arrangement is not what even the best friend of the Business Men's Racing Association would call advantageous. Indeed, it is alleged that the ink was scarcely dry on the contract when loopholes were sought through which to break the agreement.

" 'Yet, despite the almost disastrous deal the Business Men's Racing Association were compelled to make in order to kill competition two months ago through the almost ruinous requirement which mortgaged the future of that association, now that same busy business association announces its immediate intention of doubling its liabilities.

" 'There would have been some wisdom for the city to have bought City Park track as a permanent addition to City Park itself, using it as a permanent home for the National Farm and Live Stock Show, as well as a community athletic field for the people of the city; it could have been leased during the racing season to the Business Men's Racing Association or any other association having a right to use it, or there would have been some sense in the Business Men's Racing Association buying the City Park race track to present it to the city on the understanding that it was to have certain privileges. But for the Business Men's Racing Association to buy the City Park track for the pleasure of presenting it to the city and then, with the same virtually empty exchequer, presume to make another $400,000 deal, is almost an insult to the intelligence of the community.

" 'All this is the more amazing since the future of racing here is questionable at best. There are already court proceedings against it which have been sufficiently successful to endanger the permanency of the sport. Besides, the Legislature a little more than a year from now

may be anything but friendly. No one can doubt that the sport is running as a tolerated amusement through a strained interpretation of the law. It is almost by a holy conduct of the business that its supporters can feel any degree of safety with regard to it. Its success is based on nothing but gambling, for racing without betting is an inane thing.

" 'Has the Business Men's Racing Association lost its head? "Upon what meat doth this our Cæsar feed?" Surely the city administration made a serious mistake of quitting its task of running the city to foster and father in risky ways the sport of racing and its dubious future. The financial condition of the city itself is next to bankruptcy. There can be little hope for the community if those who have been placed in office to manage the municipality are reckless enough to concoct or condone deals such as the one just proposed. It does not argue well for the immediate moral or financial future of New Orleans.

" 'And when the political crowd and the racing sports combine for such an illegitimate business scheme as the one suggested they challenge the patience of decent members of the community.

" 'It is to be remembered that the fair grounds is owned by Chap Hyams and his associates. Mr. Hyams also is the principal owner of the Picayune. It will be interesting to note what the Pic has to say as to this deal. It does not take much imagination to understand what could happen if Hyams et al. have a chance to play with the city treasury.

" 'It is a mistake to have the city authorities mixing up in any business but the city's, and it is just as much a rueful error to let them own any business except what they should.

" 'To add to the aberration an understanding is reported that the Business Men's Racing Association not only intends to buy the fair grounds, but will construct within a year a concrete grandstand, stables, and exposition building at an expenditure of $400,000 more, which makes $1,200,000 to be expended by this financially depleted association. But all this is too silly to be taken seriously,'

"Meaning thereby that the said Martin Behrman, mayor, and the said Adolph G. Ricks, Harold W. Newman, Edward E. Lafaye, and Edmond J. Glenny, commission councilmen of the city of New Orleans, were about to misapply the public funds of the city of New Orleans, in that the same, or a portion thereof, were to be used or employed to purchase a tract of ground known as the Fair Grounds track, to be used in conducting, carrying on, or operating a business, calling, enterprise, or undertaking absolutely foreign to, and beyond the scope, power, and authority, and outside of the purview of, the functions of the municipal corporation of the city of New Orleans, to wit, a race track in said city where horse racing is conducted and admission fees are charged to attend, to the great damage, scandal, and disgrace of the said Martin Behrman, mayor, and the said Adolph

G. Ricks, Harold W. Newman, Edward E. Lafaye, and Edmond J. Glenny, commission councilmen of the city of New Orleans, the said Hugh A. O'Donnell then and there well knowing the said scandalous and malicious libel to be false."

A demurrer to that information was overruled, and the accused has appealed.

[1] The demurrer should have been sustained. Even if the said publication contained, as alleged in the information, the statement that the commission council was about to use the funds of the city for buying and operating a race track for the city, this would not be libelous; it would not be charging the members of the council with moral turpitude, or want of integrity, or necessarily bringing them into disrepute. Indeed, there are some good citizens of New Orleans who believe that maintaining a race track is a good thing for the city.

[2] But that statement is not contained in said publication. The publication may be said to have for its theme the possibility of the Business Men's Racing Association being backed by city funds and the condemnation of such a course. The thought running through it, in a most desultory manner, no doubt may be said to be as follows: That, the Business Men's Racing Association having purchased the City Park race track, and this association being reported by the Daily States to be about to purchase also the Fair Grounds race track, and that association having been without means to make the first of these purchases, and being still less possessed of the means with which to make the second, the query arises as to where the money is to come from, and as to whether, in view of the fact that the city administration fathered the first of these purchases, it is not about to use the funds of the city to help along the second; that, if so, the scheme is unwise, because, to all appearances, doomed to disaster; that it is even reported that the said association is to build a concrete grandstand; but that "all this is too silly to be taken seri-

ously." This appears to us to be the substance, the skeleton, of the publication; all the rest being mere language, the clothes put upon the skeleton, in partisan newspaper style.

The only assertions contained in the publication are as to the fathering of the City Park race track purchase, and as to reports having been made that the purchase of the Fair Grounds race track and the construction of a grand stand by the Business Men's Racing Association were contemplated, and as to the impecuniosity of that association. All else is stated by way of inference and comment, and the reader is left to judge of the cogency of the inference and the justness of the comment. The inferences are all stated hypothetically. Thus:

"Possibly the city administration is also fathering this latter deal." "If so, who is furnishing the money?" "Has the city hall gone out and out into the racing business?" "There can be little hope for the community if those," etc., "if Hyams et al. have a chance," etc.

The statement that "the city administration made a serious mistake of quitting its task of running the city to foster and father in risky ways the sport of racing and its dubious future" has reference by its terms to what the city administration has already done, and the only thing it is charged with having already done is that "it fathered for the Business Men's Racing Association the purchase of the City Park race track." The information does not, however, charge libel in connection with that statement; the brief of the prosecution expressly disclaims the idea of doing so. The libel is in connection with the statement, alleged to be contained in the said publication, that the commission council was about to use the money of the city to purchase the fair grounds race track.

[3] It is argued in the brief that the lending of public money to a private corporation is forbidden by law, and that therefore to make such a charge against the commission council is to charge the members thereof with misconduct in office. But, in the first place, the construction put upon said publication by the information is not that the funds of the city are about to be lent to the Business Men's Racing Association, but that they are about to be used for the purchase and operation of the fair grounds race track, and nothing is said of said purchase not being for the city. To that effect is the innuendo of the information, and the office of an innuendo is to put upon the publication the construction which the prosecution contends for. Odgers on Libel (5th Ed.) p. 115. In the second place, if the said charge is contained in said publication, it is there contained, not by way of assertion, but, as already pointed out, by way of inference from facts that are stated, in other words, by way of comment; and comment upon a matter of public interest such as this is not libel, especially by a newspaper.

The distinction between assertion of existing facts and comment upon supposedly existing facts, or, in other words, between assertion and comment, is thus stated in Odgers on Libel (5th Ed.) p. 197:

"A comment, as we have already stated, is the expression of the judgment passed upon certain alleged facts by one who has applied his mind to them, and who, while so commenting, assumes that such allegations of fact are true. The assertion of a fact is not a comment at all. If the words complained of contain allegations of fact which are denied by the plaintiff, and which the defendant cannot prove to be true, there must be a verdict for the plaintiff. It is of no avail for the defendant to urge that he honestly believed them to be true.

"Comment on well-known or admitted facts is a very different thing from the assertion of unsubstantiated facts for comment. There is no doubt that the public acts of a public man are lawfully made the subject of fair comment or criticism, not only by the press, but by all members of the public. But the distinction cannot be too clearly borne in mind between comment or criticism and allegations of fact, such as that disgraceful acts have been committed, or discreditable language used. It is one thing to comment upon or criticize, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct.

"Sometimes, however, it is difficult to dis-

tinguish an allegation of fact from an expression of opinion. It often depends on what is stated in the rest of the article. If the defendant accurately states what some public man has really done, and then asserts that 'such conduct is disgraceful,' this is merely the expression of his opinion, his comment on the plaintiff's conduct. So if, without setting it out, he identifies the conduct on which he comments by a clear reference. In either case the defendant enables his readers to judge for themselves how far his opinion is well founded; and therefore what would otherwise have been an allegation of fact becomes merely a comment. But if he asserts that the plaintiff has been guilty of disgraceful conduct, and does not state what that conduct was, this is an allegation of fact for which there is no defense but privilege or truth.

"The same considerations apply where a defendant has drawn from certain facts an inference derogatory to the plaintiff. If he states the bare inference without the facts on which it is based, such inference will be treated as an allegation of fact. But if he sets out the facts correctly, and then gives his inference, stating it as his inference from those facts, such inference will, as a rule, be deemed a comment. But even in this case the writer must be careful to state the inference as an inference, and not to assert it as a new and independent fact; otherwise his inference will become something more than a comment, and he may be driven to justify it as an allegation of fact."

[4] Comment must be fair and free of malice; but, on the assumption of the inferences drawn by said publication from the facts that are stated in it being correct, there is nothing in said publication but what is entirely legitimate.

[5] A libelous implication may be conveyed by insinuation, or by a question suggestive of an answer or accompanied by matter suggestive of an answer; but the publication in this case is not of that character. It merely draws inferences from certain facts that are stated, and comments upon them, leaving to the reader to judge of the correctness of the inferences and the appositeness of the comments, and winds up with the declaration that the whole thing is too silly to be taken seriously.

We can readily understand how public officers, conscious of a growing public confidence in the integrity and ability of their administration, should feel resentful at a publication such as this, but the slings and arrows of the opposition press are not necessarily libels.

The judgment appealed from is set aside; and the accused is ordered discharged without day.

MONROE, C. J., takes no part.